Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000201
31-OCT-2017
11:46 AM

NO. CAAP-15-0000201

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee, v.
GREGORY I. SADO, Defendant-Appellant.

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CRIMINAL NOS. 12-1-0525(1) and 14-1-0361(1))

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Reifurth and Ginoza, JJ.)

Plaintiff-Appellee State of Hawaiʻi (State) charged Defendant-Appellant Gregory I. Sado (Sado) with: (1) place to keep pistol or revolver, (2) place to keep ammunition, (3) first-degree terroristic threatening, (4) third-degree promoting a dangerous drug, and (5) prohibited acts related to drug paraphernalia. The charges stem from an altercation between Sado and Jayson Rego, Jr. (Jayson), during which Sado allegedly pointed a gun at Jayson's face, and evidence recovered by the police in their investigation at the scene. A jury found Sado guilty of these charges. The Circuit Court of the Second Circuit (Circuit Court)[1] sentenced Sado to concurrent terms of imprisonment of ten-years, five-years (3 counts), and one year.

On appeal, Sado contends that: (1) the Circuit Court erred in denying his motion to suppress packets of cocaine recovered during a search incident to his arrest; (2) the Circuit

_____

[1] The Honorable Rhonda I.L. Loo presided.

Court failed to obtain a valid waiver of his right to testify pursuant to Tachibana v. State, 79 Hawai'i 226, 900 P.2d 1293 (1995); and (3) the Circuit Court abused its discretion in sentencing him to prison based on his failure to admit guilt to the charges. We affirm.

BACKGROUND

I.

Sado's hostility toward Jayson apparently began in May 2010, when Sado's girlfriend approached Jayson and spoke briefly with him at Casanova's, a bar in Makawao, Maui. Sado took offense, immediately went up to Jayson, and said he did not like Jayson talking to his girlfriend. Jayson apologized and told Sado that he did not want any trouble. This did not appease Sado, who remained upset.

Three months later, Jayson, his younger brother Jordan, and friends Victor, Caylee, Joshua, and Cullen went to Casanova's. Sado was there with eight to ten friends, including Kili and Keahi. Sado and his friends kept glaring over at Jayson's group. At one point, Jayson and his brother went outside to talk to Sado and Kili. Jayson tried to amicably resolve Sado's "disgruntled feelings" by again apologizing to Sado and saying he did not want any trouble. Jayson offered to shake Sado's hand, but Sado refused, and everyone went back inside.

At about 1:30 a.m., when Casanova's began to close, both groups left. As Jayson was walking down the street towards his car, Sado ran up to Jayson and said that he wanted to fight. Jayson accepted the challenge and took off his shirt. While Sado was jumping around and taunting Jayson, Sado's friend, Keahi, shoved Jayson from the side. Jayson's brother, Jordan, stepped in and grabbed Keahi, and the two of them began fighting. Jayson turned to look at Jordan fighting with Keahi. When Jayson turned back toward Sado, Sado was pointing a gun at Jayson's face, holding it a few inches away. Sado said to Jayson, "[W]hat now, bitch, you effing pussy." Jayson put his hands up and started

back-pedaling. But he also told Sado, "if you're going to use it, then just use it."

As he was moving away from Sado, Jayson saw that his brother appeared to be in danger -- Jordan was on the ground with someone on top of him. Jayson ran over to help Jordan. Sado approached Jayson from behind and blind-sided Jayson with a punch to the side of Jayson's face. Jayson grabbed Sado by the shirt, they began grappling with each other, and eventually they hit a store window, breaking it. After breaking the window, Sado fell into a planter that was in front of the window.

Jayson testified to the foregoing matters at trial. Jayson's testimony that Sado had pointed a gun at Jayson's face was corroborated by the testimony of Caylee, Victor, and Cullen. Caylee testified that she saw Sado pull out a gun, point it at Jayson's face, then put the gun back in his waistband when Jayson went to help Jordan. Victor testified that he saw Sado reach into his pants, pull out a gun, point it at Jayson's face, then put the gun back in his waistband when Jayson put his hands up and moved away. Cullen testified that he heard someone yell, "gun," then saw Sado pointing a silver revolver at Jayson's head.

II.

The night of the incident was "ladies night" at Casanova's. Because it was common for the police to have disorderly conduct type calls when Casanova's closes on "ladies night," two police officers, Officers Tristian Hickman and Jared Dudoit, were already present on patrol outside of Casanova's that evening. In addition to Officers Hickman and Dudoit, two off-duty police officers were at Casanova's, and other officers responded to the scene.

As Casanova's was closing and everyone was leaving, people reported to Officers Hickman and Dudoit that there was a fight down the street. Officer Hickman ran toward, and Officer Dudoit drove his patrol car toward, the reported fight. When Officer Hickman arrived, he saw multiple physical altercations taking place among a crowd of people, and he described the situation as "quite chaotic." Officer Hickman, who was in his

police uniform, separated Sado and Jayson who were fighting. Officer Hickman then went to stop another fight. When he turned back, he saw Sado and Jayson grappling with each other. He also saw them both hit a store window, then fall into a planter outside the window. Officer Hickman went back up the street to separate Sado and Jayson again. Sado attempted to walk away, and Officer Hickman told him to stay in the area. Officer Dudoit came over to provide assistance.

Initially, Officer Dudoit grabbed Jayson and Officer Hickman grabbed Sado. However, when Officer Dudoit heard people in the crowd shouting that Sado had a gun, he let Jayson go and went to assist Officer Hickman with Sado. Officer Dudoit did a quick pat down search of Sado, who was wearing a white t-shirt and blue jeans. In conducting the pat down, Officer Dudoit was looking for weapons such as a gun or a knife, but did not feel anything he believed was a weapon. Officer Dudoit detained Sado, but did not place him under arrest. Officer Dudoit handcuffed Sado's hands behind his back and took him to Officer Dudoit's patrol car. Officer Dudoit did another pat down search of Sado for weapons and then placed Sado in the rear passenger seat of the patrol car. When Officer Dudoit closed the door, he found a round of .38 caliber ammunition on the ground near the door.

Officer Dudoit recovered the .38 caliber round, then went to interview witnesses, keeping his eye on the patrol car. While interviewing witnesses, Officer Dudoit learned that other officers at the scene had recovered a gun. After completing his investigation, Officer Dudoit believed there was sufficient evidence to arrest Sado for terroristic threatening. He went back to the patrol car, placed Sado under arrest, and advised Sado of his <u>Miranda</u> rights. Upon opening the passenger door next to Sado, Officer Dudoit noticed four additional rounds of .38 caliber ammunition in the door handle of the patrol car. Prior to using the patrol car that evening, Officer Dudoit had searched it to make sure that nothing had been left behind by the previous user, and Sado was the only person Officer Dudoit had placed in the patrol car that evening. Officer Dudoit had been watching

4

the patrol car after he left Sado in it and had not seen anyone approach the patrol car or open its doors.

After placing Sado under arrest, Officer Dudoit conducted a search incident to arrest. This search was more comprehensive than the previous pat-down searches for weapons and included a search for evidence that would connect Sado to the offense of terroristic threatening or the gun that had been recovered. During the search incident to arrest, Officer Dudoit recovered a prescription pill bottle from Sado's pocket. Officer Dudoit could see through the bottle without opening it and noticed packets containing a white powdery substance inside the bottle. Based on his training and experience, Officer Dudoit suspected the white powdery substance was cocaine. Several hours later, after returning to the Wailuku Police Station, Officer Dudoit opened the pill bottle without a search warrant. He removed the packets and performed a presumptive test for cocaine on the white powdery substance inside the packets. The substance tested presumptively positive for cocaine.

III.

During their investigation at the scene, the police recovered a .38 caliber revolver in the planter that Sado had fallen into while grappling with Jayson. The five rounds of .38 caliber ammunition recovered by Officer Dudoit outside his patrol car and in the door handle next to Sado could be used in this gun. The .38 caliber revolver recovered by the police was shown to Jayson, Caylee, Victor, and Cullen at trial, and they all testified that it resembled the gun they saw Sado point at Jayson's face. The gun was test fired with one of the .38 caliber rounds recovered by Officer Dudoit, and both were found to be operational. The white powdery substance in packets found in the pill bottle recovered from Sado's jeans pocket was analyzed and found to contain cocaine.

DISCUSSION

I.

Sado contends that the Circuit Court erred in denying his motion to suppress the packets of cocaine recovered by

Officer Dudoit during a search incident to Sado's arrest.  We disagree.

A.

At the outset, we note that the argument Sado raises on appeal is different from the argument he presented in his suppression motion before the Circuit Court.  In the Circuit Court, Sado argued that the packets of cocaine should be suppressed because five hours after recovering it from Sado, Officer Dudoit opened it at the police station without obtaining a search warrant.  In rejecting Sado's argument, the Circuit Court found that because the pill bottle was transparent or translucent, and Officer Dudoit could see the packets of cocaine inside the pill bottle in plain view, no search warrant was required to open the bottle.

On appeal, Sado does not seek to suppress the packets of cocaine because the pill bottle was opened at the police station without a warrant.  Instead, he challenges Officer Dudoit's seizure of the pill bottle from Sado at the scene, arguing that Officer Dudoit's removal of the pill bottle from Sado's pocket exceeded the permissible scope of a valid search incident to arrest.  Sado did not raise the argument he now asserts on appeal before the Circuit Court.  Accordingly, he waived this argument.  See State v. Ildefonso, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992) ("Our review of the record reveals that [the defendant] did not raise this argument at trial, and thus it is deemed to have been waived."); State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]"); State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal."); State v. Matias, 57 Haw. 96, 101, 550 P.2d 900, 904 (1976) ("[T]here can be no doubt that the making of an objection upon a specific ground is a waiver of all other objections." (internal quotation marks and citation omitted)).

B.

In any event, we conclude that Sado's argument on appeal is without merit. Officer Dudoit's seizure of the pill bottle from Sado's pocket was pursuant to, and did not exceed the permissible scope of, a valid search incident to arrest. Accordingly, the pill bottle and its contents were not subject to suppression.

1.

Under the Fourth Amendment to the United States Constitution, once a person is subject to a lawful custodial arrest, the police may search that person incident to the arrest for weapons and to discover evidence. United States v. Robinson, 414 U.S. 218, 235 (1973). The search for evidence incident to arrest is not limited to evidence related to the crime for which the person was arrested.[2] Id.

However, under the Hawai'i Constitution, the permissible scope of a search for evidence incident to arrest is more restrictive than under the Fourth Amendment. Under Article I, Section 7 of the Hawai'i Constitution, the search for evidence incident to arrest is limited to "the discovery of fruits of the crime for which the accused has been arrested" and "the

---

[2] In Robinson, the Supreme Court explained its rationale for declining to impose restrictions on the scope of the permissible search for evidence incident to a lawful arrest:

> A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

Robinson, 414 U.S. at 235.

instrumentalities used in its commission[.]" State v. Melear, 63 Haw. 488, 494, 630 P.2d 619, 624 (1981).

The Hawai'i Supreme Court has defined the scope of a permissible search incident to arrest under Article I, Section 7 of the Hawai'i Constitution as follows: "A warrantless search of an individual incident to a valid arrest properly may be directed towards a protective search for weapons, or towards the discovery of fruits of the crime for which the accused has been arrested, as well as the instrumentalities used in its commission, or to prevent the arrestee from escaping." Id. at 494, 630 P.2d at 624-25.[3/] The search incident to arrest cannot be broader than necessary to accomplish these permissible purposes. Id.

2.

Here, the pill bottle recovered from Sado during the search incident to his arrest was properly seized as a fruit or an instrumentality of the terroristic threatening offense for which he had been arrested. Prior to conducting the search incident to arrest, Officer Dudoit had received information that Sado had committed terroristic threatening by pointing a gun at Jayson's face. He also knew that a gun had been found by other officers at the scene, and he had himself recovered five rounds of .38 caliber ammunition which appeared to have been discarded by Sado. Officer Dudoit therefore, at minimum, had reason to believe that Sado may be in possession of additional ammunition. The pill bottle recovered from Sado's pocket was three inches tall and one and a half inches in diameter, large enough to conceal ammunition. Under these circumstances, we conclude that Officer Dudoit's removal of the pill bottle from Sado's pocket and his plain view observation of its contents was a permissible search incident to Sado's arrest. We therefore affirm the Circuit Court's denial of Sado's suppression motion.

---

[3/] See State v. Kaluna, 55 Haw. 361, 370-71, 520 P.2d 51, 59 (1974) (stating that a search incident to arrest is "limited in scope to a situation where it is reasonably necessary to discover the fruits or instrumentalities of the crime for which the defendant is arrested, or to protect the officer from attack, or to prevent the offender from escaping").

## II.

Sado's contention that the Circuit Court failed to obtain a valid waiver of his right to testify pursuant to Tachibana is without merit.

## A.

Immediately prior to the start of jury selection, the Circuit Court provided Sado with the following advisement:

> THE COURT: . . . [Y]ou have a constitutional right to testify in your own defense. Although you should consult with your lawyer regarding the decision to testify, it is your decision, and no one can prevent you from testifying should you choose to do so. If you decide to testify, the prosecutor will be allowed to cross-examine you.
>
> You also have a constitutional right not to testify and to remain silent. If you choose not to testify, the jury will be instructed that it cannot hold your silence against you in deciding your case.
>
> If you have not testified by the end of the trial, I will briefly question you to make sure that it was your decision not to testify. Do you understand?
>
> THE DEFENDANT: Yes, ma'am.

Just prior to the defense resting its case, the Circuit Court engaged in the following exchange with Sado:

> [Defense Counsel]: My client is ready for the Tachibana, Your Honor.
>
> THE COURT: Okay.
>
> Mr. Sado, as I discussed with you before at the start of the trial, you have a constitutional right to testify in your own defense. Although you should consult with your lawyer regarding the decision to testify, it is your decision, and no one can prevent you from testifying should you choose to do so.
>
> If you decide the [sic] testify, the prosecutor will be allowed to cross-examine you; in other words, ask you questions. You also have a constitutional right not to testify and to remain silent.
>
> If you choose not to testify, the jury will be instructed that it cannot hold your silence against you in deciding your case.
>
> It is my understanding today that you wish to --
>
> [Defense Counsel]: Your Honor, my client will not be testifying and asserting his right to remain silent.
>
> THE COURT: Okay. So it's my understanding today that you do not intend to testify. Is it your decision not to testify?

9

THE DEFENDANT: Yes, ma'am.

THE COURT: All right. And you had an opportunity to consult with [defense counsel] about this decision?

THE DEFENDANT: Yes, ma'am.

THE COURT: And regardless of his advice, you decided to testify -- this is a decision you made of your own free will?

THE DEFENDANT: To not testify.

THE COURT: To not testify?

THE DEFENDANT: Yes, ma'am.

THE COURT: Is anyone forcing you or making you not testify?

THE DEFENDANT: No, ma'am.

THE COURT: Are you doing this voluntarily of your own free will?

THE DEFENDANT: Yes, ma'am.

THE COURT: Nobody is using any pressure, threats or coercion to get you to not testify?

THE DEFENDANT: No, ma'am.

THE COURT: Okay. And regardless of [defense counsel's] advise [sic], is it your decision not to testify in your trial. Is that correct?

THE DEFENDANT: Yes, ma'am.

THE COURT: All right.

## B.

In Tachibana, the supreme court stated that:

In conducting the [ultimate] colloquy, the trial court must be careful not to influence the defendant's decision whether or not to testify and should limit the colloquy to advising the defendant

that he or she has a right to testify, that if he or she wants to testify that no one can prevent him or her from doing so, and that if he or she testifies the prosecution will be allowed to cross-examine him or her. In connection with the privilege against self-incrimination, the defendant should also be advised that he or she has a right not to testify and that if he or she does not testify then the jury can be instructed about that right.

Tachibana, 79 Hawaii at 236 n.7, 900 P.2d at 1303 n.7 (citation and brackets omitted).

10

Sado argues that the Circuit Court's Tachibana colloquy was defective because the Circuit Court did not inquire if Sado understood and ensure that he understood each element of the Tachibana advisement. In determining whether a defendant validly waived his or her right to testify at trial, we "look to the totality of the facts and circumstances of each particular case." State v. Han, 130 Hawai'i 83, 89, 306 P.3d 128, 134 (2013) (internal quotation marks and citation omitted).

Here, the record indicates that Sado was a high school graduate who attended college in two separate years; that he had no difficulty reading or understanding English; that he was represented by counsel; that counsel had discussed Sado's testimonial rights and Sado's decision on whether to testify with Sado; and that Sado fully understood that the decision to testify was his decision, regardless of the advice of his counsel. Although the Circuit Court did not ask Sado at the end of the case whether he understood the Tachibana advisement, Sado indicated that he understood the Circuit Court's pretrial advisement, which had covered every element of the Tachibana advisement. Moreover, there is nothing in the record to suggest that Sado harbored any uncertainty or lack of understanding of his Tachibana rights, or that any "salient fact" existed that would impede his ability to understand these rights. See State v. Barros, 105 Hawai'i 160, 169-70, 95 P.3d 14, 23-24 (App. 2004). Under these circumstances, we reject Sado's claim that his waiver of the right to testify was invalid.

## III.

Sado argues that the Circuit abused its discretion in sentencing him to prison based on his failure to admit guilt to the charges. We disagree.

### A.

After Sado was arrested on the night of the incident, he waived his Miranda rights and agreed to be interviewed by the police. During this police interview, Sado denied that he had been carrying a gun and denied any knowledge of the gun and ammunition recovered at the scene or the cocaine found in the

pill bottle recovered from his pocket. Sado was interviewed a second time approximately two weeks after the incident. In this second interview, Sado again denied that he had a gun during his altercation with Jayson. During the second interview, Sado was discovered using his cell phone under a table to text Keahi, who was at the police station waiting to be interviewed, telling Keahi not to say anything. Also, after asking to use the bathroom at the police station, Sado "blurted out" to Keahi to refuse to answer questions and to ask for a lawyer.

Sado's theory of defense at trial was that the gun belonged to Jayson and that the police had manufactured evidence against him and had failed to perform an impartial investigation because Jayson's father was a police officer. Sado did not testify at trial, and he declined to exercise his right of allocution at sentencing.

In imposing its sentence on Sado, the Circuit Court provided an extensive explanation of why it was sentencing him to terms of imprisonment. The Circuit Court stated:

> THE COURT: Okay. Thank you very much, gentlemen.
>
> Stand up, Mr. Sado.
>
> What kind of person brings a gun, much less a loaded firearm, to a bar? Were you going to use it? Were you showing off? Were you trying to scare someone? Or all of the above?
>
> This whole case from day one with this Court has been about deny, deny, deny. But five people that -- the five people who testified to the jury, the five people who the jury found to be credible all say that you were the one with the gun that night. You were the one that pointed this gun inches, inches from Jayson Rego's face. You were the one who smacked him on the side of the head. And you two were the ones that ended up in the window of the Sherri Reeve's Gallery, and so on and so forth. It's about denial, and it's about blame.
>
> Let's talk about blame a little bit. I sat through that trial, and so did the jury. And I'll tell you, I've never seen a case where so many different people got blamed for so many different things. Police got blamed for being keystone cops, placing bullets -- et cetera. [Jayson's father] got blamed for trying to influence the police department because he's a retired police officer. [Jayson] got blamed for either bringing the gun or having planted the gun, or something along those lines. But let's talk about what's factual. Let's talk about the what jury heard, what this Court heard, and what you were found guilty of.

There was five people who you saw with a gun. You were the only one that was seen that night with a gun. One gun that you denied. This gun was found in a planter near the area where you and Jayson Rego ended up smashed into the Sherri Reeve Gallery. Right where you guys were wrestling or fighting, that's where the gun was found.

The bullets, the five bullets. One bullet was found outside of the patrol car. You were the only one that night put into the patrol car. Into the patrol car. In the patrol car, four other identical bullets were found in the interior of the patrol car in the door handle. So one outside, four inside, all .38 caliber, all match, all fit the gun that was found that you denied. And you were the only one in the car that night. Does it fit? I think so. Do the pieces fit? They sure do.

You deny about the drugs being found. The drugs were found in a pill container in your pocket. When you were interviewed by the probation officer, one of the concerns was when you asked about drugs -- she asked you about drugs, you said you didn't do any drugs. Yet they found five baggies, packets inside this pill container, totaling approximately 2.91 grams of cocaine in your pocket in the police car.

You're charged, Mr. Sado, with five very, very serious matters today; four of which are felonies, and one is a misdemeanor. And for whatever reason, I'm trying to rack my brain about, how did this whole thing start? What's the problem? What happened between you and Jayson Rego to get this far? What kind of bad blood is there between the two of you?

I don't know if it had something to do with the ex-girlfriend and previous girlfriend and your run-in with Jayson Rego back at Casanova's back in May. And I think there was a bumping in at Lulu's a couple weeks later, and then you guys end up back at Casanova's on July 15, 2010.

I know at one point, he tried to shake your hand, he tried to make amends. He tried to apologize on previous occasions, even though he did not do anything wrong. He was trying do what his parents taught him to do; apologize, walk away from trouble, don't get involved. And that's what he tried to do.

That night he offered you an olive branch. He offered to shake your hand and pretty much let it go. You refused that night to shake his hand. You refused to let it go. You said something along the lines "it ain't good, we still got problems," or something to that effect.

And when it was all done that night and everyone was disbursing and going home after Casanova's closed that night, and they were going home, Jayson and brother and his friend Caylee and her boyfriend Victor and the other friend, Cullan . . ., they were just minding their own business, walking down Makawao Avenue, going to their cars with the intent of just going home. You're the one who came after him. You're the one who confronted him. You're the one who threatened him, held the gun to his face, pulled the gun on

him. Pulled the gun on him. What does he do? He raised his hand, he backed away, and he didn't want any problems. He didn't want any trouble with you. Defensive posture, he raised his hands. That's what he did.

And then he saw his brother being attacked by one of the other cohorts of yours, so he ran after that and went to help his brother. And that's when you cold-cocked him, tussle began, you guys smashed into the planter, and eventually into the Sherri Reeve's Gallery window. And that's where we are today.

So everything that happened that night happened for -- happened at your hands. It really shows to me that you have no responsibility for what -- you're taking no responsibility for what took place back on July 15th, 2010.

And when the police did interview -- and I found this extremely disturbing. When the police interviewed you down at the station and you were saying whatever you were saying, more denials when you were talking to the police. What did they catch you doing? Texting under the table. Texting [Keahi], telling him not to make a statement.

They looked at your phone. They saw who you were texting. And when you had to go on a bathroom break, one of the detectives stuck had his head out to let the other detective know that you were taking a bathroom break, you yell into [Keahi] and basically tell him not to say anything and lawyer up.

So how is that taking responsibility? I don't get it. I don't get it. These are serious crimes. And serious crimes deserve serious punishment. People can't go around brandishing weapons. People can't go around accusing innocent people of planting evidence, planting guns, planting drugs. This is not the kind of world that we live in. And you've been telling lie after lie after lie.

And it's really disheartening. Because when I read your PSI, I found 20, 30, letters from people that you have known all your life. Family, friends, people you went to church with, Father Colton came here today to speak on your behalf. All these people say they know you. And they know what you're capable of, and they say you're a good person. But all these people were not there on July 15, 2010.

Caylee . . . was there. Cullan . . . was there. Jordan Rego was there. Jayson Rego was there. Victor . . . was there. They all know what you are capable of. They saw firsthand what you were capable of. And although for you it may -- it's been a long four or four and a half years, and you had to live through this, and you've turned your life around. Not once did I hear you say anything or to think about what has Jayson Rego had to go through.

This has been hanging over him as well. He doesn't know what the outcome was. Four and a half years have gone by. He's tried to go on with his life, but he still feels the effects of being threatened with a gun that he doesn't even know was loaded on unloaded that night. His life

14

probably flashed before his eyes. You had long-term -- you've had a long-term effect on him as well. You know, he has to live with this as well. And you keep thinking you own Makawao town, or something along those lines.

While what I see here is, even though you've done well in the past four, four and a half years, you still need a major attitude adjustment. So I'm making the attitude adjustment right now.

### B.

"[A] sentencing judge generally has broad discretion in imposing a sentence." Keawe v. State, 79 Hawai'i 281, 284, 901 P.2d 481, 484 (1995). "[A] sentencing court may consider any and all accurate information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." Id. at 286, 901 P.2d at 486.

In light of the Circuit Court's remarks, it is clear that its focus in, and overriding justification for, sentencing Sado to imprisonment was the serious and dangerous nature of his conduct -- bringing a gun and ammunition to a bar and pointing the gun at Jayson's head -- and the character he revealed -- escalating matters and refusing to accept Jayson's attempts to make peace -- in committing the charged offenses. The Circuit Court also properly relied on its view that Sado had lied to the police in denying any involvement in threatening Jayson with a gun and in denying any knowledge of the gun, ammunition, or drugs recovered at the scene. Evidence that Sado had lied to the police was relevant to an assessment of his character. Such evidence, as well as his telling Keahi not to talk to the police, also indicated a lack of remorse for his criminal conduct.

### C.

In State v. Kamana'o, 103 Hawai'i 315, 82 P.3d 401 (2003), the supreme court stated that "it is well settled that a sentencing court may consider a defendant's lack of remorse in assessing the likelihood of successful rehabilitation." Kamana'o, 103 Hawai'i at 321, 82 P.3d at 407. It further stated, however, that "[a] sentencing court . . . may not infer a lack of remorse from a criminal defendant's refusal to admit guilt." Id.

It is difficult in many cases to evaluate the "subtle, yet meaningful, distinction" between a trial judge "[permissibly] imposing a harsher sentence upon a defendant based on his or her lack of remorse, on the one hand, and [a trial judge impermissibly] punishing a defendant for his or her refusal to admit guilt, on the other[.]" Id. In Kamanaʻo, the supreme court applied the following three-factor analysis in determining whether the sentencing court erroneously relied upon the defendant's refusal to admit guilt in imposing the sentence: "(1) the defendant's maintenance of innocence after conviction, (2) the judge's attempt to get the defendant to admit guilt, and (3) the appearance that, had the defendant affirmatively admitted guilt, his sentence would not have been so severe." Id. at 323, 82 P.3d at 409 (block quote format, citation, and brackets omitted).

Here, Sado maintained his innocence after the jury's guilty verdicts, but the Circuit Court did not attempt to induce Sado to admit his guilt at sentencing. We conclude that the dispositive factor in this case is whether it appears that the Circuit Court would not have imposed its sentence of concurrent terms of imprisonment if Sado had affirmatively admitted his guilt.

Certain aspects of the Circuit Court's remarks could be interpreted as indicting that the Circuit Court based its decision to sentence Sado to imprisonment on his refusal to admit guilt to the charges. However, viewing the Circuit Court's statements as a whole, it appears clear that the overriding factors relied upon by the Circuit Court were the serious and dangerous nature of Sado's conduct in committing the charged offenses and the character he revealed in committing the offenses, lying to the police, and attempting to induce Keahi not to cooperate. The Circuit Court's remarks do not suggest that had Sado affirmatively admitted his guilt to the charges, his sentence would have been less severe. We therefore decline to overturn the Circuit Court's sentence.

16

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

DATED: Honolulu, Hawai'i, October 31, 2017.

On the briefs:

Benjamin E. Lowenthal
for Defendant-Appellant.

Peter A. Hanano
Deputy Prosecuting Attorney
County of Maui
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge

17